**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

|   |   |   |
|---|---|---|
| **JEFFERY HANNAN,** | : | |
| | : | |
| **Plaintiff,** | : | |
| **vs.** | : | **CIVIL NO. 05-2863** |
| | : | |
| **CITY OF PHILADELPHIA, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

_____

**RUFE, J.**                                                              **August 22, 2007**

<u>**MEMORANDUM OPINION AND ORDER**</u>

This matter comes before the Court on the Defendants' Motion for Summary Judgment.  After reviewing the Defendants' Motion [Doc. # 26], the Plaintiff's Brief in Opposition thereto [Doc. # 30], the Defendants' Reply Brief [Doc. # 32], and the Plaintiff's Sur-Reply Brief [Doc. # 33], the Court will **GRANT IN PART** and **DENY IN PART** the Defendants' Motion, for the reasons stated below.

**BACKGROUND**

**A. Introduction**

In this civil-rights case filed under 42 U.S.C. § 1983, Officer Jeffery Hannan of the Philadelphia Police Department ("Department") is suing the City of Philadelphia ("City") and three other Department officials—Commissioner Sylvester Johnson, Inspector William Blackburn, and Karen Byrd, seeking damages arising out of his transfer and suspension in 2003.  He argues that by transferring him from the elite Narcotics Strike Force ("Strike Force") to the 18th District, a patrol

division, and then later suspending him for 15 days without pay, the City and the Department officials violated several of his constitutional and statutory rights.

At its essence, this case arises from Hannan's perception that Department Commissioner Sylvester Johnson disciplined him on illegitimate grounds. Although Commissioner Johnson claims that he disciplined Hannan for conduct unbecoming of a police officer, Hannan argues that he was transferred and suspended as an act of retaliatory and racial animus. Because this is a motion for summary judgment, the Court views the factual record in the light most favorable to Hannan, the non-moving party.[1]

**B. Facts**

Officer Jeffery Hannan has been an officer with the Department since March 1, 1993. Hannan began his police service as a patrol officer in the 14th District, where he eventually became a member of the Narcotics Enforcement Team. In 1998, Hannan approached Commissioner Johnson (then Deputy Commissioner), and expressed interest in an appointment to the Strike Force, an elite unit that operates city-wide rather than in a single patrol district. Commissioner Johnson appointed Hannan to the Strike Force in March of 1998, where he excelled. He became a speaker at judicial conferences, where he would educate judges on the illicit narcotics industry. In 2000, he also became an instructor at Top Gun, an annual narcotics-enforcement training program at the National Guard Training Center, a military base in Fort Indiantown Gap, Pennsylvania.

The incident that underlies this litigation occurred while Hannan was serving as a Top Gun instructor in October 2002. One evening during the training program, before a day off, Hannan

---

[1] Elliot & Frantz, Inc. v. Ingersoll-Rand Co., 457 F.3d 312, 318 (3d Cir. 2006).

and several other off-duty instructors went drinking at a local bar,[2] later returning to "a party back at the rooms in the guy's [sic] building."[3]   Hannan arrived at the party with Janine Miller, another Top Gun instructor who at the time was employed by the Office of the Pennsylvania Attorney General.  Because Miller did not want to be "the only girl here,"[4] Hannan agreed to walk with Miller back to the women's dormitory to invite another female officer named Donna to come along.  While Donna was getting ready, Hannan and Miller stood in the common area, and Miller stooped down to get some drinks out of the refrigerator.

Hannan stated that Miller "was teasing [him] throughout the night about something she had of mine."[5]   Upon realizing that his cell phone was missing, Hannan went into Miller's doorway, where he "fell over her."[6]   Then, they "were rolling on the ground."[7]   Hannan said that when he told Miller that he needed the cell phone to call his wife, Miller seemed "a little irate" upon learning that he was married.[8]   Then, Donna walked into the room.  Seeing them on the floor, she said "do you guys want me to leave?"[9]   Hannan and Miller said "no," then got up, and went with Donna back to the party in the men's building, where they stayed for about an hour.  Hannan

---

[2]  Hannan testified at his deposition that he could not remember how much he had had to drink that night. Hannan Dep., 32:21, Oct. 12, 2006.

[3]  Id. 22:13.

[4]  Id. 22:22.

[5]  Id. 23:22.

[6]  Id. 24:3.

[7]  Id.

[8]  Id. 24:8.

[9]  Id. 24:12.

maintains that "[e]verybody was laughing and having a good time."[10]

When Hannan left the party, he went directly to his room.  Upon realizing that he still did not have his cell phone, he went back to the party to look for it.  Realizing that "the girls had left," he "went over to their building, knocked on the door, [and said] somebody give me my phone."[11]  When no one let Hannan in, he returned to his room and went to bed.

The next day, on his day off, Hannan received word at about 2:30 p.m. that the Colonel in charge of the military base wanted to speak with him.  Hannan then went to the Colonel's office, where the Colonel told him that Janine Miller had filed a police report, claiming that Hannan had sexually assaulted her.  The Colonel then told Hannan that he insisted that both he and Miller leave the military base.

Miller's account of the events, documented in a police report filed with the Fort Indiantown Gap Police Force, alleged:

> [On the night in question], someone from the Top Gun Academy came into [Miller's] room and tried to assault her.  Janene [sic] Miller stated that while she was getting something out of her refrigerator, someone walked into her room and grabbed her from behind.  The person then pinned her onto the ground and started to rub their hands up and down her body.  She identified this person as Jeff, (someone that was in her class).  She told him to get off of her, he refused.  She immediately tried pushing him away from her, but was unsuccessful.  Donna M. O'lonnell [sic] (7-18-65) entered the room and noticed that Jeff was on top of her.  Donna asked what was gong [sic] on?  Janene [sic] Miller yelled for help, so Donna grabbed Jeff's shoulder and pulled him off of her.[12]

---

[10] Id. 24:24.

[11] Id. 25:11.

[12] Pl.'s Exs. in Support of Undisputed Facts [Doc. # 31], Ex. 4.

On that same day, after Hannan and Miller left Fort Indiantown Gap, Commissioner Johnson received a phone call from the Colonel. Commissioner Johnson stated in his deposition that the Colonel "told me that . . . the person, who we had sent up there to teach a class, was intoxicated and he tried to rape one of the women up there."[13] Commissioner Johnson then told Deputy Commissioner of Operations Robert Mitchell that there "may be a possible rape" and that he wanted it investigated.[14]

When Hannan returned to duty on the Strike Force in Philadelphia, his supervisor, Captain William S. Broadbent, Jr., also requested that the Department's Internal Affairs Division open an investigation into the events at Fort Indiantown Gap. Internal Affairs then assigned Captain Broadbent to conduct the investigation. Defendant William Blackburn, Chief Inspector of the Strike Force, also became involved in the investigation.

When Broadbent completed his investigation, he recommended that no discipline be imposed against Hannan. Broadbent then sent the investigation packet, along with his recommendation, to Commissioner Johnson. According to Commissioner Johnson, Mitchell later recommended that Hannan be fired through Commissioner's Direct Action ("CDA").[15] Mitchell made this recommendation after both he and Commissioner Johnson had reviewed Captain Broadbent's investigation.[16]

Broadbent also sent the packet to Captain Deborah Mateffy of the Charging Unit. The

---

[13] Johnson Dep. 8:5–7, Oct. 24, 2006.

[14] Id. 10:21–22.

[15] Id. 14:18–19; 15:7. CDA is a method that the Commissioner may use to discipline officers directly, without relying on the findings of a Police Board of Inquiry hearing.

[16] Id. 17.

Charging Unit—which is a component of the Police Board of Inquiry ("PBI")—is the body that files formal disciplinary charges against members of the Department.  Captain Mateffy, whose duty it is to review cases and decide whether to file disciplinary charges, reviewed Captain Broadbent's investigation.  Captain Mateffy determined that there was insufficient justification for charges against Hannan.

Despite her determination that no charges should be filed with the PBI, Captain Mateffy "was instructed from 'someone of higher rank'" to file the charges.[17]  The charges accused Hannan of conduct unbecoming of a police officer.  On March 18, 2003, Captain Broadbent presented Hannan with the charges, and explained that Hannan had the choice either to sign the charges "guilty" or "not guilty," or else agree to a transfer out of the Strike Force.[18]  Hannan signed the charges "not guilty."[19]

Pursuant to Hannan's "not guilty" claim, the PBI then held a formal proceeding before a three-member panel on June 5, 2003, to determine whether Hannan's conduct at Top Gun constituted conduct unbecoming of an officer.  That same day, the PBI panel unanimously voted to find Hannan not guilty.[20]  In a memorandum to Commissioner Johnson dated June 6, 2003, the PBI informed the Commissioner that the panel "found the testimony of P.O. Hannan to be more credible than that of the complainant, Janene [sic] Miller, and other witnesses called on her behalf."[21]  Despite

---

[17] Pl.'s Statement of Undisputed Facts, ¶ 45.

[18] Hannan Dep. 52–53.

[19] Id. 53:8.

[20] Pl.'s Exs. in Support of Undisputed Facts [Doc. # 31], Ex. 14.

[21] Id.

the PBI's conclusions, the Commissioner decided that Hannan "should be disciplined, no matter what the trial board said."[22]  Shortly thereafter, Commissioner Johnson transferred Hannan from the Strike Force to the 18th District.[23]   Several months later, he issued Hannan a 15-day suspension without pay.

The transfer and suspension harmed Hannan both financially and emotionally. Financially, Hannan's income level dropped substantially.  He lost opportunities to work significant overtime as a member of the Strike Force.  And because the suspension and transfer tended to corroborate his undeserved reputation as a "groper,"[24] and took away the elite position in which he had excelled, Hannan "suffered depressions, spells of crying and anxiety," which ultimately resulted in outpatient medical treatment at Friends Hospital.[25]

Hannan, maintaining his innocence throughout all these events, grieved his discipline through the procedures of the collective-bargaining agreement between the police union and the City. This grievance process culminated in arbitration under the auspices of the American Arbitration Association.  On May 17, 2005, the arbitrator, finding that the Commissioner had transferred and suspended Hannan without just cause, concluded that the City had violated the terms of the collective-bargaining agreement.[26]  The arbitrator rescinded the transfer and suspension, and awarded Hannan damages to compensate him for all wages, benefits, and overtime lost during his absence

---

[22]  Johnson Dep. 35:5.

[23]  Pl.'s Statement of Undisputed Facts ¶ 54.

[24]  Hannan Dep. 13:11.

[25]  Pl.'s Statement of Undisputed Facts ¶ 59.

[26]  Defs.' Exs. to Reply Br. [Doc. # 34], Ex. 8.

from the Strike Force.[27]   The arbitrator also ordered the City to expunge all of the records of the wrongful discipline.[28]

Hannan filed this suit shortly thereafter, seeking damages for violation of his Constitutional and statutory rights.  Hannan has named the City, Commissioner Johnson, Inspector Blackburn, and Karen Byrd (the Commissioner's secretary) as Defendants.  Hannan is Caucasian and the individual Defendants are all African-American.  Hannan asserts claims under § 1983 for First Amendment retaliation, depriving him of property and liberty without due process of law, violating his right to equal protection under the law, and for constitutional violations arising out of official City policy.  Hannan further asserts claims for conspiracy to violate his civil rights under 42 U.S.C. § 1985(3), violation of the Pennsylvania Mental Health Procedures Act, and for intentional infliction of emotional distress.  This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343, and supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367.

**DISCUSSION**

**A. Legal Standard**

Under Federal Rule of Civil Procedure 56(c), the Court should grant summary judgment to the moving party if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[29]  In making this

---

[27] Id. at 23.

[28] Id.

[29] Fed. R. Civ. P. 56(c).

determination, the Court "'must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'"[30]

Although this standard of review is designed to give the nonmovant the benefit of every doubt, he must still produce enough evidence to persuade a reasonable jury to find for him at trial. Specifically, "the plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[31]

## B. Review of Hannan's Claims

### 1. First Amendment Retaliation

Under the First Amendment, "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances."[32]  This prohibition is binding on state governmental bodies as well.[33]  Hannan argues that by signing the charges "not guilty," thus triggering a hearing before the PBI, that he was in effect requesting a name-clearing hearing, which amounts to a petition to the City for redress of his smeared reputation.  Hannan claims that by transferring and later suspending him, Commissioner Johnson retaliated against him for exercising his First Amendment rights.

Under the law of the Third Circuit, "[t]o state a First Amendment retaliation claim,

---

[30] Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007) (internal citation omitted).

[31] Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

[32] U.S. Const. amend. I.

[33] DeHart v. Horn, 227 F.3d 47, 50 (3d Cir. 2000).

a plaintiff must allege two things: (1) that the activity in question is protected by the First Amendment, and (2) that the protected activity was a substantial factor in the alleged retaliatory action."[34]  As to the first element, Defendants argue that Hannan signing the charges did not amount to an act protected by the First Amendment.   As to the second element, Defendants argue that Hannan has not set forth sufficient evidence such that a jury could reasonably find a causal link between Hannan's request for a name-clearing hearing and the subsequent discipline.

*a. Protected Activity*

Turning to the first element, Defendants argue that Hannan's "not guilty" signature on the charges is not protected conduct, because it does not constitute a petition to the government for a redress of grievances.   Pointing out that Commissioner Johnson has the ultimate say in all police disciplinary matters and that the PBI verdict does not bind the Commissioner, Defendants argue that a favorable finding at the PBI does not actually have the power to redress Hannan's grievance.   Indeed, it is true that the PBI result did not fully vindicate Hannan, since the Commissioner went on to discipline him despite the PBI's recommendation against doing so. Nonetheless, the Court concludes that Hannan's choice to opt for a non-binding name-clearing hearing constituted a "petition" under the First Amendment.

The Court notes preliminarily that this is a question of law.[35]  The Supreme Court has defined acts under the Petition Clause very broadly, and indeed has held that "the right to petition extends to all departments of the government."[36]  Thus, citizens have the constitutional right to seek

---

[34]  Hill v. Borough of Kutztown, 455 F.3d 225, 243 (3d Cir. 2006).

[35]  Id.

[36]  Calif. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972).

redress from a legislature,[37] from executive officials,[38] and through the judicial process,[39] without fear of reprisal by the government.  Additionally, the Third Circuit has given broad scope to the Petition Clause in the context of employee grievances against an employer.

In San Filippo v. Bongiovanni,[40] the Third Circuit held that a fired college professor's lawsuits and employee grievances against his university employer could be protected under the Petition Clause, even though they did not address matters of public concern.  In so holding, the Third Circuit explicitly parted ways with the other circuit courts to have addressed the question, which have all refused to recognize a private employee grievance against a government employer as protected activity under the Petition Clause.[41]   The San Filippo court stated that "when government—federal or state—formally adopts a mechanism for redress of those grievances for which government is allegedly accountable, it would seem to undermine the Constitution's vital purposes to hold that one who in good faith files an arguably meritorious 'petition' invoking that mechanism may be disciplined for such invocation by the very government that . . . has given the particular mechanism its constitutional imprimatur."[42]

---

[37]  E. R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961) (advertising campaign designed to influence legislation protected under Petition Clause).

[38]  United Mine Workers v. Pennington, 381 U.S. 657 (1965) (labor union's efforts to persuade Secretary of Labor to change minimum-wage rules protected under Petition Clause).

[39]  Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 741 (1983) ("[T]he right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances.").

[40]  30 F.3d 424 (3d Cir. 1994).

[41]  See, e.g., Altman v. Hurst, 734 F.2d 1240, 1244 n.10 (7th Cir. 1984) (police officer reassigned as an act of retaliation for filing a civil suit against his employer not protected under the Petition Clause, because "a private office dispute cannot be constitutionalized merely by filing a legal action").

[42]  San Filippo, at 442.

Although the Defendants argue that Hannan's insistence on a PBI hearing is not such a "formal mechansim," because it is not binding on Commissioner Johnson, the Court nonetheless believes that the law in this Circuit informs the Court's decision that Hannan was attempting to vindicate the same First Amendment values implicated by a more formal petition for redress.  The Supreme Court has stated, in a decision interpreting the Petition Clause, that "[t]he first amendment interests involved in private litigation" include "compensation for violated rights and interests, the psychological benefits of vindication, [and] public airing of disputed facts."[43]  Although the PBI hearing did not have the power to compensate Hannan for any violated rights, Hannan has specifically stated that he requested the PBI hearing to clear his name—which implicates both of the other First Amendment values that the Supreme Court recognized are inherent in private litigation. Thus, based on the Third Circuit's broadened scope of the Petition Clause in San Filippo to include private employee grievances, and recognizing Hannan's request for a PBI hearing as implicating First Amendment values recognized by the Supreme Court, the Court concludes that Hannan's request for a PBI hearing as a name-clearing device is protected by the Petition Clause.

    *b. Substantial Factor*

Turning to the second element of the retaliation claim, Defendants argue that a rational jury could not reasonably find that his request for a name-clearing hearing was a substantial factor in the discipline—i.e., that his request for a hearing caused Commissioner Johnson to discipline him.  In support, Defendants argue only that causation cannot be inferred simply by the temporal proximity between the protected act and the subsequent discipline.  In other words, the fact that Commissioner Johnson meted out punishment shortly after the PBI verdict is alone not enough

---

[43] Bill Johnson's Restaurants, Inc., 461 U.S. at 743.

to prove causation.

It is true that under Third Circuit precedent, timing between protected activity and discipline may not alone be enough to permit an inference of retaliation.[44]   Nonetheless, the Third Circuit looks to "the context of the record as a whole"[45] to determine whether a jury could find the necessary causal link to prove retaliation.[46]   Thus, this Court must look at the totality of the circumstances to determine whether a rational jury could reasonably find that Hannan's request for a name-clearing hearing played a substantial role in his ultimate discipline.

For example, Hannan testified in his deposition that despite Captain Mateffy's recommendation that Hannan not be charged at the PBI, the Department leadership insisted that Hannan be charged, unless he agreed to be transferred to a patrol district.[47]   Hannan believed that he could choose a district for transfer, or else face the charges.[48]   After the PBI verdict, however, Commissioner Johnson transferred Hannan to the 18th District—further from his home geographically than any other district.[49]   Moreover, three months later, on September 18, 2003, Commissioner Johnson executed a Notice of Suspension, suspending Hannan from duty without pay

---

[44]   See, e.g., Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003) (noting that timing of retaliation, without additional evidence, must be "unusually suggestive" to support inference of causation).

[45]   Id.

[46]   See Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997) (in determining causation in retaliation case, "proffered evidence, looked at as a whole, may suffice to raise the inference."); see also Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279–81 (3d Cir. 2000) (collecting retaliation cases illustrating a variety of circumstances under which record as a whole was held to support a prima facie case of causation).

[47]   Hannan Dep. 52:19–20.

[48]   Id.

[49]   Id. 72:24.

for 15 days.[50]  Therefore, not only did Hannan receive punishment despite the not-guilty PBI verdict, but he received a more severe punishment.

Furthermore, a neutral arbitrator later determined that Commissioner Johnson had disciplined Hannan without just cause.  While this does not directly tend to prove a causal link, it casts doubt on the Commissioner's purported reason for disciplining him, thus suggesting that there must be another reason, e.g., retaliation.  This evidence, while not conclusive, is sufficiently suggestive of retaliatory animus to allow a jury to reasonably conclude that Commissioner Johnson meted out discipline against Hannan as an act of retaliation.

Defendants point out that an employer "may defeat the employee's [retaliation] claim by demonstrating that the same adverse action would have taken place in the absence of the protected conduct."[51]  Accordingly, they argue that Hannan cannot prove causation, because Commissioner Johnson would have disciplined Hannan had he never requested a PBI hearing.  The Defendants cite Commissioner Johnson's deposition testimony, in which he states:

> The fact that he was up there as an instructor for the Philadelphia Police Department, the fact that he was in that room by his own admission, that he had been drinking on the form of being intoxicated, the fact that he's in the women's dormitory at that time of night, the fact that he winds up on the floor looking for his cell phone or not, I thought he should be disciplined.[52]

In other words, if Commissioner Johnson was planning to discipline Hannan, no matter what the PBI said, then there cannot have been any retaliatory motive.

---

[50]  Defs.' Exs. To Reply Br. [Doc. # 34], Ex. 6.

[51]  Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005).

[52]  Johnson Dep. 35:7–14.

- 14 -

While this might in fact be true, the Court would have to impermissibly credit the deposition testimony of Commissioner Johnson as true at the summary-judgment stage—a stage at which the facts are to be viewed in the light most favorable to the non-moving party.[53] Indeed, this credibility determination is all the more important in light of the fact that Defendants have not pointed to any corroborating evidence to support Johnson's testimony—for example, an internal Department memorandum drafted before the PBI hearing—that could document the prospective punishment to be imposed. Moreover, Commissioner Johnson did not explain in his deposition the reason for imposing a harsher discipline (transfer to 18th District, plus 3-week suspension) after the PBI hearing, as compared to the discipline originally proposed (transfer to a patrol district of Hannan's choice).

Therefore, the Court is satisfied that based on the totality of the circumstances, a rational jury could conclude that the Commissoner retaliated against Hannan for insisting on a name-clearing hearing before the PBI. The motion for summary judgment, therefore, will be denied on this claim with respect to Commissioner Johnson.

Turning to the evidence of retaliation on the part of Defendant Karen Byrd, there is insufficient evidence to present retaliation claims against her to the jury. In his Complaint, Hannan alleged that Byrd was "the person that actually signed the 15-day suspension notice."[54] He also alleges that she "signed the name of Sylvester Johnson, doing so with actual or apparent authority of Defendant Johnson."[55] There is no record evidence, however, that Byrd did anything other than

---

[53] <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000) (at summary judgment, court "may not make credibility determinations or weigh the evidence").

[54] Compl. ¶ 20.

[55] <u>Id.</u>

a ministerial act in signing the suspension form.  Because no evidence tends to prove that Byrd herself had a retaliatory motive in signing the Commissioner's signature on the suspension, she is entitled to judgment as a matter of law on this claim.

As for Inspector Blackburn, there is similarly a lack of evidence to prove that he engaged in retaliation.  According to the Complaint, Inspector Blackburn is "in Plaintiff's chain-of-command,"[56] and Hannan suggests that Blackburn manipulated the internal charging process to make sure that Hannan was charged, despite Captain Mateffy's decision not to file charges with the PBI.  However, there is no evidence that Blackburn participated in the ultimate transfer and suspension after Hannan requested his name-clearing hearing.  Therefore, because retaliation requires a showing of a causal link between protected activity and adverse action, there is insufficient evidence for a jury to find that Inspector Blackburn is liable for First Amendment retaliation.  Thus, Inspector Blackburn is entitled to judgment as a matter of law on this claim.

## 2.  Due Process

Under the Fourteenth Amendment, "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law."[57]  Hannan argues that because Commissioner Johnson suspended and transferred him against the unanimous recommendation of the PBI, that he was deprived of his liberty and property without due process of law.

The Third Circuit has held that "[t]o state a claim under § 1983 for deprivation of procedural due process rights, a plaintiff must allege that (1) he was deprived of an individual

---

[56]  Id. ¶ 21.

[57]  U.S. Const. amend XIV, § 1.

interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'"[58] Hannan posits that his job in the Strike Force constituted a property interest, and that his reputation as a police officer constitutes a liberty interest, both of which he was deprived of without due process.

Assuming <u>arguendo</u> that Hannan's transfer and suspension deprived him of liberty and property interests,[59] Hannan has not presented evidence for a reasonable jury to conclude that those deprivations occurred without due process of law.  The Third Circuit has stated that in a government employee's employment-termination case, due process provides that "'the tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.'"[60] In other words, "due process requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment."[61]  Hannan does not dispute that his hearing before the PBI amounted to a valid pre-deprivation hearing—on the other hand, he argues that Commissioner Johnson, by not adhering to the PBI's recommendation, denied him due process.

Hannan makes much of the idea that by disciplining him despite the PBI's findings, Commissioner Johnson violated due process by acting arbitrarily.  He asserts that there are no

---

[58] <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 233 (3d Cir. 2006).

[59] The parties have not briefed the Court on this issue.  The Supreme Court has stated that "[p]roperty interests are not created by the Constitution, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ."  <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 538 (1985) (internal quotation and citation omitted).  The parties have not pointed to any source of law—Pennsylvania state law or otherwise—that defines whether Hannan's right to maintain his position within the Department is a protected property entitlement.  Therefore, the Court has not addressed the issue.

[60] <u>McDaniels v. Flick</u>, 59 F.3d 446, 454 (3d Cir. 1995) (quoting <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 546 (1985)).

[61] <u>Id.</u>

documented cases of an officer from the Department being acquitted before the PBI, yet still disciplined by the Commissioner afterward.   The Court interprets this as an argument that Commissioner Johnson was not an impartial decisionmaker.

"[D]ue process demands impartiality on the part of those who function in judicial or quasi-judicial capacities."[62]   The Third Circuit, however, has also held that neutral post-deprivation proceedings can cure any such bias on the part of the decisionmaker.   In <u>McDaniels v. Flick</u>,[63] the Third Circuit held that a fired college professor could not demonstrate a due-process violation—even if the decision to fire was the product of a sham proceeding—until he exhausted his post-deprivation remedies under a collective-bargaining agreement.   The court, reviewing similar decisions from other circuits, concluded that in the employment-termination context, a due-process violation "'is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process.'"[64]   Accordingly, the court held that "a discharged employee cannot claim in federal court that he has been denied due process because his pretermination hearing was held by a biased individual where he has not taken advantage of his right to a post-deprivation hearing before an impartial tribunal that can rectify any possible wrong committed by the initial decisionmaker."[65]

Here, Hannan availed himself of such post-deprivation proceedings.   Therefore, even if Hannan's pre-deprivation process was tainted by an impartial decisionmaker, he received a post-deprivation hearing designed to remedy that defect.   The Third Circuit has held that a grievance

---

[62]   <u>Abdulrahman v. Ashcroft</u>, 330 F.3d 587, 596 (3d Cir. 2003) (citing <u>Schweiker v. McClure</u>, 456 U.S. 188, 195 (1982)).

[63]   59 F.3d 446 (3d Cir. 1995).

[64]   <u>Id.</u> at 460 (quoting <u>Zinernon v. Burch</u>, 494 U.S. 113, 126 (1990)).

[65]   <u>Id.</u>

mechanism in a collective-bargaining agreement—such as the one that Hannan used in this case—can adequately substitute for state-provided post-termination proceedings, provided that those proceedings comply with due process.[66]  And Hannan does not argue that the grievance proceedings did not provide due process—in fact, he was put back into his rightful position after the arbitration. Therefore, under the Third Circuit's precedents, the Court finds no basis upon which a reasonable jury could find that he was denied of his due-process rights.

3.  Equal Protection

Under the Fourteenth Amendment, "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws."[67]  Hannan's equal-protection claims (one of which he styles as a claim for "race discrimination,") are based on the theory that Commissioner Johnson, who is African-American, intentionally treated Hannan more harshly than other similarly-situated African-American officers, without any rational basis.  Although Hannan raises three theories of recovery under the equal-protection clause,[68] the only plausible one is that Hannan falls under the

---

[66]  Dykes v. SEPTA., 68 F.3d 1564, 1571 (3d Cir. 1995).

[67]  U.S. Const. amend XIV, § 1.

[68]  The Court will dispose of two of these theories in short order.  First, Hannan suggests that the Defendants violated his equal-protection rights by denying him due process.  The Court, however, has already reviewed Hannan's claim for relief brought directly under the due-process clause, and therefore will not undertake another due-process analysis "through" the equal-protection clause.  Hannan does not cite to any legal authority—nor does the Court independently know of any—that establishes a separate due-process analysis through the lens of the equal-protection clause.

Second, Hannan also now raises, for the first time, an equal-protection claim under the Pennsylvania Constitution.  Hannan did not include such a claim in his Amended Complaint, and therefore it is unfair to the Defendants to have them defend the claim now, after discovery is complete and their respective cases have been prepared.  Thus, the Court will not entertain this claim.  See Satterfield v. Borough of Schuylkill Haven, 12 F. Supp. 2d 423, 433 (E.D. Pa. 1998) (dismissing claim raised for the first time in a summary-judgment brief, because "the Plaintiff failed to notify the opposing parties and the court of such a claim on a timely basis").

- 19 -

"class of one" doctrine announced by the Supreme Court in <u>Village of Willowbrook v. Olech</u>.[69]

Under the class-of-one theory, a plaintiff can establish a violation of the equal-protection guarantee

if he can show that "(1) the defendant treated him differently than others similarly situated, (2) the

defendant did so intentionally, and (3) there was no rational basis for the difference in treatment."[70]

   The Court concludes that Hannan has not produced a quantum of evidence that could

persuade a reasonable jury that he was intentionally treated any harsher than his colleagues.  In his

Opposition Brief, Hannan states that he "produced the names of black NSF officers who engaged

in misconduct, such as stealing drug buy or confiscated drug money, but these persons were allowed

to return to NSF following resolution of the alleged misconduct."[71]  Hannan then cites to his

Statement of Undisputed Facts, which provides:

> Hannan is the only white officer to have either been alleged or
> actually found to have engaged in misconduct and was removed from
> NSF and kept from returning to NSF.  However, there are black male
> and female officers who have been accused or actually committed
> misconduct, including stealing a safe from the NSF building, which
> safe containing [$]8900 in confiscated drug money, and all of these
> officers were removed from NSF but later returned.[72]

This paragraph in the Statement of Undisputed Facts then cites fifteen pages of Hannan's deposition

testimony.[73]

   After reviewing the cited pages of Hannan's deposition, the Court finds only one

---

[69] 528 U.S. 562 (2000).

[70] <u>Hill</u>, 455 F.3d at 239.

[71] Pl.'s Opp'n [Doc. # 30], at 11.

[72] Pl.'s Statement of Undisputed Facts ¶ 66.

[73] Hannan Dep. 111–25.

reference to similarly-situated officers.  According to the testimony, Officer Brenda Jones and one of her colleagues, both African-American females, were suspended from the Strike Force after making a racial slur to a Caucasian waitress.[74]  The testimony suggests that they were later reinstated to the Strike Force without the necessity of going through the grievance process.[75]  In this section of the deposition, these are the only two officers specifically mentioned.

Hannan also explains his theory that the top leadership in the Department, which he claims is mostly African-American, favors putting other black officers in the Strike Force, ahead of more qualified Caucasian officers, although he provides no supporting details.[76]  He then states:

> I actually wanted to—I wanted all the PBIs and the decisions since Johnson's been Commissioner.  I requested that through my lawyer. I—I had asked Captain [Mateffy of the Charging Unit] personally if she had records of that.  And she told me, yes, they're there.  So, we can actually pull, which I thought would have been a great idea, which we have some in the Seitzer Green report.  But if we broke each one down, compared to race, gender, I think it would be shocking.

This testimony, if presented at trial, is not sufficient to persuade a reasonable jury that Hannan was purposefully treated differently than his fellow officers.  Again, the only specific evidence is the Brenda Jones anecdote, unsupported by any documentary evidence or corroborating deposition testimony.  The other support is merely Hannan's personal "hunch" that he is treated more harshly because he is white.  The Court is not obligated to sift through the entire record to see if

---

[74]  Id. 112:2–11.

[75]  Id.

[76]  Id. 121:17–122:23.

Hannan has produced evidence supporting this claim.[77]  The only evidence that he cites in his briefs could not convince a rational trier of fact that he was intentionally treated differently without a rational basis.  Thus, the Defendants are entitled to judgment as a matter of law on this claim as well.

4. Qualified Immunity

Defendants raise the affirmative defense of qualified immunity in their Answer.[78]  The doctrine of qualified immunity "is intended to shield government officials performing discretionary functions, including police officers, 'from liability [for] civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[79]  Because only one constitutional claim will remain after the Court's present ruling—namely a First Amendment-retaliation claim against Commissioner Johnson—the Court will confine its qualified-immunity analysis to that claim.

Under Supreme Court precedent, the question of whether an officer is shielded by qualified immunity is a two-part test.  First, the Court asks, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"[80]  Second, the Court asks "whether the right was clearly established," that is, "whether it

---

[77] Amnesty Am. v. Town of W. Hartford, 288 F.3d 467, 470 (2d Cir. 2002); see also Dawley v. Erie Indem. Co., 100 Fed. Appx. 877, 881 (3d Cir. 2004) ("Rule 56 does not oblige a district court to scour the entire record to find a factual dispute.").

[78] Answer to Am. Compl., at 21.

[79] Kopec v. Tate, 361 F.3d 772, 776 (3d Cir. 2004) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

[80] Saucier v. Katz, 533 U.S. 194, 201 (2001).

would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[81]

Applying this two-part test, the Court notes that the first part of the Saucier test is satisfied. The Court has already determined in its summary-judgment analysis that a reading of the record in the light most favorable to Hannan supports a claim of First Amendment retaliation against the Commissioner. Turning to the second prong of Saucier, however, the Court views the question of whether Commissioner Johnson's conduct was objectively reasonable under the circumstances as dependent on historical facts that must be resolved at trial.

The Supreme Court has recognized that determination of the objective reasonableness of an officer's conduct, while often a question of law for the reviewing court,[82] sometimes requires the resolution of facts by a jury.[83] The reasonableness of certain constitutional violations can frequently be determined by the Court—for example, with excessive-force claims brought under the Fourth Amendment. In those cases, "[t]he test of reasonableness . . . is whether under the totality of the circumstances, the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, <u>without regard to their underlying intent or motivations</u>."[84] But in cases where the officer's motive is a question of historical fact that is inseparable from merits of the underlying claim, the courts have recognized the appropriateness of allowing a jury to decide

---

[81] <u>Id.</u> at 201–02.

[82] <u>See id.</u> at 202 (early qualified-immunity determination appropriate to "'avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment'") (quoting <u>Harlow</u>, 457 U.S. at 818).

[83] <u>See, e.g.</u>, <u>Johnson v. Jones</u>, 515 U.S. 304 (1995) (dismissing interlocutory appeal from district court's pretrial decision to deny three police officers qualified immunity, because there was a factual dispute as to whether they were present at the beating that was the subject of the lawsuit).

[84] <u>Kopec</u>, 361 F.3d at 776 (emphasis added).

whether the officer's conduct was objectively reasonable.[85]  Indeed, in any case where "a genuine issue exists as to any material fact [with respect to the underlying constitutional claim], a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis."[86]

Here, the Court has already determined that Commissioner Johnson's state of mind is a genuine issue of material fact for the jury.  The Court also concludes, therefore, that for the purposes of determining whether Johnson is qualifiedly immune, the question of whether his decision to discipline Hannan after the PBI hearing is objectively reasonable is inseparable from the question about his motivation—a matter of historical fact.  Thus, the Court will deny the Commissioner's motion for summary judgment on the defense of qualified immunity.  The Commissioner will have the opportunity at trial to persuade the jury that his conduct was objectively reasonable.


5. Municipal Liability of Defendant City

In Count I of his Complaint, Hannan names the City as a Defendant, alleging municipal liability for the actions of its officers under the well-known rule of Monell v. Department of Social Services.[87]  In the words of the Third Circuit, under Monell, "a municipality can be sued

---

[85] See, e.g., Monteiro v. City of Elizabeth, 436 F.3d 397 (3d Cir. 2006) (in First Amendment-retaliation case, question of whether defendant's motivation in ejecting town councilmember was constitutionally permissible was properly reserved for the jury); Barton v. Curtis, No. 06-3336, __ F.3d __, 2007 U.S. App. LEXIS 18065 (3d Cir. July 30, 2007) (dismissing interlocutory appeal of Fourth Amendment wrongful-arrest case, in which district court submitted to the jury the question of defendant's state of mind in filing a probable-cause affidavit in support of arrest warrant ).

[86] Curley v. Klem, 298 F.3d 271, 278 (3d Cir. 2002).

[87] 436 U.S. 658 (1978).

directly under § 1983 if it is alleged to have caused a constitutional tort through a policy, ordinance, regulation or officially adopted decision that has been promulgated by the municipality's officers."[88] Additionally, liability attaches "for a municipality's constitutional violations resulting from governmental custom even though such custom has not been formally approved via the official decision making channels."[89]

Here, Hannan claims that Commissioner Johnson's act of transferring him and later suspending him constitutes an unconstitutional policy of the City, such that the City should be liable to him.  Though seemingly counterintuitive, it is nonetheless true that even a single act of a high-ranking public official can constitute an official policy of a municipality, provided that the public official is "responsible for establishing final government policy respecting such activity[.]"[90] Accordingly, Hannan contends, because Commissioner Johnson has final policymaking authority, the transfer and suspension are policy decisions attributable to the City.

Hannan's arguments that Commissioner Johnson has such final policymaking authority, however, are unpersuasive.  Under Supreme Court precedent, "whether a  particular official has 'final policymaking authority' is a question of state law."[91]  Therefore, Hannan's burden of production to survive summary judgment on this claim must include at a minimum some state or municipal legal authority describing the source and nature of Commissioner Johnson's disciplinary

---

[88] Brennan v. Norton, 350 F.3d 399, 427 (3d Cir. 2003).

[89] Id.

[90] Pembaur v. City of Cincinatti, 475 U.S. 469, 483 (1986).

[91] City of St. Louis v. Praprotnik, 485 U.S. 112, 118 (1988).

powers.[92]  Hannan simply points to Commissioner Johnson's deposition testimony, in which he admitted that he is a policymaker.[93]  Commissioner Johnson's statements, however, are not a source of law.  This Court will not decide whether the Commissioner has final policymaking authority with respect to disciplinary matters based solely on his deposition testimony.   Hannan has not supplied the Court with any other authority describing the Commissioner's powers.

Moreover, based on the undisputed facts, it is clear that Commissioner Johnson's discretionary decision to transfer and suspend Hannan were subject to review by an arbitrator.  In fact, the arbitrator (empowered by a collective-bargaining agreement between the City and the police union) reversed the Commissioner's disciplinary actions.  The Third Circuit has held that "if a municipal employee's decision is subject to review, even discretionary review, it is not final and that employee is therefore not a policymaker for purposes of imposing municipal liability under § 1983."[94]  Applying this rule, the Court concludes that as a matter of law, Commissioner Johnson's discretionary decision to transfer and suspend Johnson cannot be the basis for municipal liability against the City.[95]  Therefore, the City is entitled to judgment as a matter of law on Hannan's Monell claim.

---

[92]  See, e.g., LaVerdure v. County of Montgomery, 324 F.3d 123, 125 (3d Cir. 2003) (single member of County Board of Commissioners did not have final policymaking authority to bind the municipal defendant, because under a Pennsylvania state statute, only a majority of the three-member board is authorized to establish policy).

[93]  See Pl.'s Opp'n, at 35.

[94]  Brennan, 350 F.3d at 428.

[95]  The Court notes that municipal liability can also flow from an unconstitutional governmental custom. Hannan does not argue, nor does the Court independently find, that Commissioner Johnson's acts were a custom that could properly support a claim for liability against the City.

6. Claim under 42 U.S.C. § 1985(3)

> To establish a violation of 42 U.S.C. § 1985(3), a plaintiff must show:
>
> (1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States.[96]

The chain of events that purportedly establishes this claim does not reveal any racial or class-based discriminatory animus.  Hannan's evidence simply boils down to one fact: that he is Caucasian, and the top brass in the Department is African-American.

In his brief, he spends three pages alluding to conversations that occurred among Commissioner Johnson, Inspector Blackburn, and Deputy Commissioner Mitchell, after the Fort Indiantown Gap incident.[97]  Hannan also refers to Defendant Byrd, whose only involvement in the events is her signature on Hannan's suspension order.  Notably, Hannan does not explain how these conversations, taken as a whole, demonstrate racial or class-based discriminatory animus.  No matter how strong Hannan's "hunch" may be that he was a target based on his race, he may not manufacture a jury-triable issue based merely on the fact that African-American decisionmakers may have decided to discipline him behind closed doors.  Therefore, the Court will enter summary judgment in favor of Defendants on this claim as well.

---

[96] <u>Farber v. City of Paterson</u>, 440 F.3d 131, 134 (3d Cir. 2006) (internal quotation and citation omitted).

[97] Pl.'s Opp'n [Doc. # 30], at 13–15.

7. State-law claims

    *a. Pennsylvania Mental Health Procedures Act*

        In his Complaint, Hannan alleges that he sought medical care for emotional distress arising out of his transfer and suspension, and that "he was also ordered to enter a hospital for mental treatment for the situational depression."[98]  Hannan also alleges that the Defendants "depriv[ed him of his] property privacy rights by releasing without consent, privilege or authority the Plaintiff's medical and mental health information and in violation of HIPPA [sic]."[99]

        In the summary-judgment briefs, however, the parties do not address HIPAA, or any other federal statute.  Rather, they discuss Section 7111 of the Pennsylvania Mental Health Procedures Act.[100]  That statute provides that "[a]ll documents concerning persons in treatment shall be kept confidential and, without the person's written consent, may not be released or their contents disclosed to anyone except . . . [list of four exceptions]."[101]  Thus, Hannan, with the Defendant's implied consent, appears to have converted this claim into a claim for relief under a Pennsylvania statute.

        Frankly, the arguments surrounding this claim for relief are beset with the same problems that the Court has struggled with throughout the resolution of this motion for summary judgment, but to a greater degree.  The Plaintiff has not clearly established the facts relevant to this

---

[98]  Compl. ¶ 48.

[99]  Compl. ¶ 87.  The Court presumes that this is a reference to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. 104-191, 110 Stat. 1936 (codified in scattered sections of Titles 18, 26, 29, and 42 of the U.S. Code).

[100]  50 P.S. § 7111.

[101]  Id. § 7111(a).

claim. Neither Plaintiff nor Defendants have explained the governing law to the Court, nor how it applies to the parties in this case. The Court is left with the text of a statute, an uncited police report (which the Court found only after sifting through an exhibit binder), the handwritten text of which is only partially legible,[102] and legal arguments that ramble from the Supreme Court's surveillance jurisprudence under the Fourth Amendment, to the meaning of privacy under Roe v. Wade.[103]

Hannan does not precisely describe the course of events, and the law's applicability to those facts to establish liability on the part of the Defendants. Hannan does not state who wrote the police report, who released it, or who saw it. Therefore, the Court finds this cause of action unintelligible, and unfit for resolution by a jury. The court will enter judgment as a matter of law in favor of Defendants on this claim.

### b. Intentional Infliction of Emotional Distress

Lastly, Hannan seeks damages for intentional infliction of emotional distress. Under Pennsylvania law, "'[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.'"[104] The Pennsylvania courts have been reluctant to allow recovery under this theory of relief. One court has noted, "the conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency,

---

[102]  Pl.'s Exs. in Support of Undisputed Facts [Doc. # 31], Ex. 19.

[103]  410 U.S. 113 (1973).

[104]  Hoy v. Angelone, 554 Pa. 134, 151 (1998) (quoting Restatement (Second) of Torts § 46(1) (1965)).

and to be regarded as atrocious, and utterly intolerable in a civilized society."[105]  Additionally, "it has not been enough that the defendant has acted with intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort."[106]

The Pennsylvania Supreme Court's decision in Hoy v. Angelone summarizes this area of the law as follows:

> Cases which have found a sufficient basis for a cause of action of intentional infliction of emotional distress have had presented only the most egregious conduct. See e.g., Papieves v. Lawrence, 437 Pa. 373, 263 A.2d 118 (1970) (defendant, after striking and killing plaintiff's son with automobile, and after failing to notify authorities or seek medical assistance, buried body in a field where discovered two months later and returned to parents (recognizing but not adopting section 46)); Banyas v. Lower Bucks Hospital, 293 Pa. Super. 122, 437 A.2d 1236 (1981) (defendants intentionally fabricated records to suggest that plaintiff had killed a third party which led to plaintiff being indicted for homicide); Chuy v. Philadelphia Eagles Football Club, 595 F.2d 1265 (3d Cir. 1979) (defendant's team physician released to press information that plaintiff was suffering from fatal disease, when physician knew such information was false).[107]

Based on this, the Court concludes that Hannan cannot, as a matter of law, prevail on a claim for intentional infliction of emotional distress.  Even if he persuades the jury that Commissioner Johnson disciplined him more severely for exercising his First Amendment rights, the Court does not consider this to be in the category of "the most egregious conduct."  Again, the Pennsylvania courts have

---

[105] Buczek v. First Nat'l Bank of Mifflintown, 366 Pa. Super. 551, 558 (1987).

[106] Hoy, 554 Pa. at 151 (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).

[107] Id.

limited this tort to cover "only the most clearly desperate and ultra extreme conduct."[108]  The three cases described by the Pennsylvania Supreme Court in <u>Hoy</u> are in an altogether different category than the facts presented here.  Secretly burying a dead body in a field without notifiying the authorities, or intentionally causing an innocent person to be criminally indicted, are of a degree of outrageousness that far exceeds the facts of this case.  Whereas retaliation in the workplace is unlawful and potentially harmful, not all claims of retaliation surpass the bounds of the everyday.

This Court finds it highly unlikely that the Pennsylvania Supreme Court would find these facts sufficiently extreme and outrageous to support liability under this theory.  Therefore, the Court is unwilling to stretch the bounds of established Pennsylvania law by allowing this claim to be presented to the jury.  Accordingly, the Court will enter summary judgment in favor of the Defendants on this claim as well.

**CONCLUSION**

For the foregoing reasons, the Court will enter summary judgment in favor of Defendants Blackburn, Byrd, and the City of Philadelphia as to all Counts of Hannan's Complaint.  The Court will deny Commissioner Johnson's Motion for Summary Judgment as to Count V (Retaliation), and grant the Commissioner's Motion for Summary Judgment on all other counts.

An appropriate Order follows.

---

[108] <u>Id.</u> at 152.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                                          :
JEFFERY HANNAN,                                           :
                                                          :
              Plaintiff,                                  :
       vs.                                                :        CIVIL NO. 05-2863
                                                          :
CITY OF PHILADELPHIA, et al.,                             :
                                                          :
              Defendants.                                 :
_____:

## ORDER

      **AND NOW**, this 22nd day of August 2007, upon consideration of the Defendants' Motion for Summary Judgment [Doc. # 26], the Plaintiff's Brief in Opposition thereto [Doc. # 30], the Defendants' Reply Brief [Doc. # 32], and the Plaintiff's Sur-reply Brief [Doc. # 33], and the applicable law, it is hereby

      **ORDERED**, that the Defendants' Motion for Summary Judgment [Doc. # 26] is **GRANTED IN PART** and **DENIED IN PART**; it is further

      **ORDERED**, that Judgment is **ENTERED** in favor of Defendants Blackburn, Byrd, and the City of Philadelphia, on all counts of the Plaintiff's Complaint; it is further

      **ORDERED**, that Judgment is **ENTERED** in favor of Defendant Commissioner Johnson on Counts I, II, III, IV, and VI of the Complaint **ONLY**; and it is further

      **ORDERED**, that Commissioner Johnson's Motion for Summary Judgment is **DENIED** with respect to Count V of Plaintiff's Complaint.

      The matter will be set down for trial at a future date.

BY THE COURT:

/s/ Cynthia M. Rufe

_____

CYNTHIA M. RUFE, J.